**HANDGARDS, INC., a Corporation, Plaintiff-Appellee,**

v.

**ETHICON, INC., a Corporation, Defendant-Appellant.**

**Nos. 83–1575, 83–1646.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 20, 1983.

Decided Aug. 2, 1984.

As Amended Sept. 26, 1984.

Maxwell M. Blecher, Blecher & Collins, Joel R. Bennett, Nancy Miller Bennett, Kendrick, Netter & Bennett, Los Angeles, Cal., for plaintiff-appellee.

David F. Dobbins, Dunne, Phelps, Mills & Jackson, San Francisco, Cal., for defendant-appellant.

Before SNEED, KENNEDY, and BOO-CHEVER, Circuit Judges.

SNEED, Circuit Judge:

Handgards, Inc. (Handgards) filed this suit against Ethicon, Inc. (Ethicon) for initiating and pursuing a series of bad faith patent infringement suits in an attempt to monopolize the market for heat-sealed plastic gloves sold to manufacturers of home hair coloring kits. A jury returned a verdict in favor of Handgards, and Ethicon appealed. In *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir.1979) (*Handgards I*), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980), we established a clear and convincing standard for section 2 antitrust liability resulting from the prosecution of a patent suit in bad faith. We then reversed and remanded this case for a new trial.

After a new trial, the jury found Ethicon liable under section 2 of the Sherman Act. The district court denied Ethicon's motion for a judgment notwithstanding the verdict. *See Handgards, Inc. v. Ethicon, Inc.*, 552 F.Supp. 820 (N.D.Cal.1982) (*Handgards II*). Ethicon appeals this judgment in all respects. We affirm.

Ethicon's appeal raises the following issues:

1. Does this court have jurisdiction over this appeal?

2. Does substantial evidence support the jury's finding that Handgards had proven by clear and convincing evidence that Ethicon prosecuted its patent infringement action in bad faith in violation of section 2 of the Sherman Act?

3. Did the trial court err in refusing to instruct the jury that liability under the Sherman Act required a finding by the jury that Ethicon's patent infringement suit was a "sham" proceeding within the meaning of the *Noerr-Pennington* doctrine?

4. Were the injuries suffered by Handgards such as to afford it standing to seek treble damages under the Sherman

Act as required by *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)?

5. Was the damage award by the jury properly supported by the evidence?

6. Did the trial court err in awarding post-judgment interest from the date of the entry of the first judgment in 1976?

After concluding that this court has jurisdiction to hear and determine this appeal, we resolve each of these issues in a manner favorable to Handgards.

## I.

## FACTS AND PROCEEDINGS BELOW

A complete statement of the facts is set forth in *Handgards I,* 601 F.2d at 988–92; therefore, here we shall outline the history of the prior litigation only briefly.

In 1962 Ethicon filed a patent suit against Plasticsmith, Inc. and Mercury Manufacturing Company, two corporations that subsequently combined to form Handgards. Ethicon alleged that these corporations had infringed its Gerard and Orsini patents involving the production of plastic gloves. In 1968 the trial court entered judgment for Handgards because it found Ethicon's Gerard patent invalid on the basis of "prior public use" by Lyle Shabram. Ethicon had dropped its enforcement of the Orsini patent earlier in the case. This court affirmed the district court's decision, and the Supreme Court denied review. *Ethicon, Inc. v. Handgards, Inc.,* 432 F.2d 438 (9th Cir.1970), *cert. denied,* 402 U.S. 929, 91 S.Ct. 1525, 28 L.Ed.2d 863 (1971).

Meanwhile, in 1968 Handgards filed this civil antitrust action alleging that Ethicon and its parent, Johnson & Johnson, "had either unilaterally or in concert, monopolized, attempted to monopolize, and conspired to monopolize trade and commerce for the purpose of eliminating plaintiff as a

competitor in the sale of disposable plastic gloves to the health care and medical markets." *Handgards I,* 601 F.2d at 989. Handgards also sought a declaration of invalidity of the Orsini patent. *Id.* at 991. The jury found the Orsini patent valid under a preponderance of the evidence proof standard; yet, it found Ethicon liable for bad faith prosecution of the invalid Gerard patent. The jury also found that no conspiracy to monopolize had existed between Johnson & Johnson and Ethicon. Handgards was awarded $2,073,000 before trebling. *See id.* at 991–92. On appeal, we reversed the jury's antitrust verdict and imposed a clear and convincing standard of proof for bad faith prosecution of a patent infringement action. *Id.* at 996–98.[1]

After a new jury trial, the district court entered a verdict of $3,587,331 before trebling, attorneys' fees of $1,064,943, and about $3,000,000 in post-judgment interest. *Handgards II,* 552 F.Supp. at 824. Ethicon's motion for a judgment notwithstanding the verdict, or, in the alternative, a new trial was denied. *Id.* at 821.

## II.

## JURISDICTION

■ In 1982 Congress passed the Federal Courts Improvement Act of 1982 in part to promote predictability, uniformity, and the efficient administration of patent law. Pub.L. No. 97–164, 96 Stat. 25. *See* S.Rep. No. 275, 97th Cong., 1st Sess. 1, *reprinted in* 1982 U.S.Code Cong. & Ad.News 11. To achieve these goals, Congress created the United States Court of Appeals for the Federal Circuit (Federal Circuit). *See generally* Note, *An Appraisal of the Court of Appeals for the Federal Circuit,* 57 S.Cal. L.Rev. 301 (1984). The Federal Circuit was given exclusive jurisdiction "of an appeal from a final decision of a district court of the United States ... if the jurisdiction of that court was based, *in whole or in part,*

---

**1.** We also found "that no evidence of any overall scheme to monopolize exist[ed] *apart* from allegations that directly relate[d] to the bad faith prosecution charges." 601 F.2d at 994

(emphasis in original). Thus, Handgards' second claim of an "overall scheme" to monopolize was rejected.

on section 1338." 28 U.S.C. § 1295(a)(1) (1982) (emphasis added). Section 1338(a) gives district courts exclusive jurisdiction over "any civil action arising under any Act of Congress relating to patents." 28 U.S.C. § 1338 (1982). Because section 1295 is in effect for all appeals filed after October 1, 1982, *see* Pub.L. 97–164, § 402, 96 Stat. 57, it is applicable to this appeal. Both parties suggest that we have jurisdiction, and we agree.[2]

The phrase "based, in whole or in part, on section 1338," is new and, as far as we know, has not been interpreted in the context of a mixed patent/antitrust appeal by any court. Commentators have argued that this language could support several types of jurisdiction.[3] *See* Newman, *Tails and Dogs: Patent and Antitrust Appeals in the Court of Appeals for the Federal Circuit,* 10 Am.Pat.L.A.Q.J. 237, 238–39 (1982); Note, *supra,* at 326–33. The House Report states that "[c]ases will be within the jurisdiction of the Court of Appeals for the Federal Circuit in the same sense that

---

**2.** Our ability to determine whether this appeal lies within section 1291 or section 1295 is inherent in a court's ability to determine its own jurisdiction. *See United States v. United Mine Workers of America,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); C. Wright, *The Law of Federal Courts* § 16 (4th ed. 1983).

**3.** Judge Jon O. Newman has summarized three basic approaches to the Federal Circuit's jurisdiction as follows:

First, the CAFC [ (Federal Circuit) ] could have what might be called traditional "arising under" jurisdiction. Under this approach an entire case would be appealable to the CAFC if a claim in the district court arose under the patent laws. That approach would clearly send the whole case to the CAFC when the plaintiff asserted a patent claim (either of infringement or patent invalidity), but might not have this effect if the patent claim was asserted only as a defense. Second, the CAFC could have what might be called "case" jurisdiction. Under this approach, the entire case would be appealable to the CAFC, so long as there was a patent issue in the case, whether or not that issue was raised solely as a defense. Third, the CAFC could have what might be called "issue" jurisdiction. Under this approach, only the patent issues would be appealable to the CAFC, leaving the remaining issues for appeal to the court of appeals for the pertinent geographic area.

cases are said to 'arise under' federal law for purposes of federal question jurisdiction." H.R.Rep. No. 312, 97th Cong., 1st Sess. 41 (1981). *See also id.* at 23–24. The Senate Report explicitly adopts the same position:

> It has been argued that a jurisdictional grant to the new court to consider appeals from a district court when jurisdiction was based, "in whole or in part," on section 1338 of title 23 [sic] (which confers on the district courts original jurisdiction of any civil action arising under an act of Congress relating to patents, plant variety protection, copyright and trademarks) is too broad and that specious patent claims will be tied, for example, to substantial antitrust claims in order to create jurisdiction in the Court of Appeals for the Federal Circuit. However, the statutory language in question requires that the district court have jurisdiction under 28 U.S.C. § 1338. This is a substantial requirement.

Newman, *supra,* at 238–39. A student note advances a fourth approach that combines both case and issue jurisdiction. *See* Note, *supra,* at 332–33. We believe that only one approach is possible under the language of the statute and its legislative history. Congress expressly adopted "arising under" jurisdiction and rejected case and issue jurisdiction. *See infra* text (quoting House and Senate Reports adopting "arising under" approach); S.Rep. No. 275, *supra,* at 19, *reprinted in* 1982 U.S.Code & Ad. News at 29 (rejecting case jurisdiction approach); *Hearings on Court of Appeals for the Federal Circuit Act of 1981,* H.R.Rep. No. 312, 97th Cong., 1st Sess. 41 (1981) (rejecting the issue jurisdiction approach adopted for the Temporary Emergency Court of Appeals in *Coastal States Marketing Inc. v. New England Petroleum Corp.,* 604 F.2d 179 (2d Cir.1979)).

We recognize that traditional "arising under" jurisdiction poses certain problems for patent appeals. *See* Lever, *The New Court of Appeals for the Federal Circuit (Part II—Conclusion),* 64 J.Pat.Off.Soc'y 243, 254–58 (1982); Note, *supra,* at 328–30 (pointing out that many cases with substantial patent issues evade "arising under" jurisdiction because of the well-pleaded complaint rule and existing intercircuit conflicts on the issue of patent jurisdiction). However, Congress was aware of these problems and nonetheless chose to adopt the existing "arising under" framework. We are not free to disregard this express congressional intent.

S.Rep. No. 275, 97th Cong., *supra,* at 19, *reprinted in* 1982 U.S.Code Cong. & Ad. News at 29.

Whether the district court's jurisdiction here arose "under any Act of Congress relating to patents" presents a difficult issue.[4] We do have the benefit of hindsight, however, to determine what issues were adjudicated in the district court.[5] This hindsight facilitates the determination of the substantiality of the district court's jurisdiction under 28 U.S.C. § 1338 (1982) in both trials. In the district court proceedings from which this appeal is taken (*Handgards II*) the jurisdiction of that court was neither based in whole or in part on section 1338. The entire proceeding was based on the antitrust laws. *See* 15 U.S.C. § 4 (1982). Jurisdiction under section 1338 was irrelevant.[6] The situation with respect to *Handgards I* is more complicated. True, the major thrust of the district court proceedings in *Handgards I* was toward the antitrust laws, but it is also true that in those proceedings the validity of the Orsini patent was litigated. The determination that the Orsini patent was

valid, however, in no way altered Ethicon's liability under the antitrust laws.[7] It, of course, had no effect on our jurisdiction to hear and determine the *Handgards I* appeal because at that time 28 U.S.C. § 1295(a)(1) (1982) had not been enacted. *See* 28 U.S.C. § 1291 (1976). Whether it would have deprived us of jurisdiction had it been in effect is an issue we need not address. The important fact is that both we and the district court had jurisdiction beyond question in *Handgards I.* It would be both wasteful and foolish for us now to hold that we lack jurisdiction to hear and determine the appeal in *Handgards II* because had section 1295(a)(1) been effective in 1979 our appellate jurisdiction in *Handgards I* would have been subject to question. We, therefore, hold that we have jurisdiction to hear and determine this *Handgards II* appeal. Under these circumstances, the district court's jurisdiction in *Handgards II* was not based, in whole or in part, on section 1338 jurisdiction.

Our holding obviously foreswears any attempt to establish definitively the precise scope of 28 U.S.C. § 1295(a)(1) (1982).[8] It

4. For a discussion of "arising under" jurisdiction in the patent context, sec C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3582 (1975 & 1980 Supp.).

5. An appellate court must look beyond the stated jurisdictional basis to determine the nature of the claims actually litigated. *See* C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1206, at 77 (1969).

6. Of course, the fact that this suit required an interpretation of the patent laws to determine antitrust liability does not make it "arise under" section 1338. *See Koratron Co. v. Deering Milliken, Inc.,* 418 F.2d 1314, 1316–18 (9th Cir. 1969), *cert. denied,* 398 U.S. 909, 90 S.Ct. 1692, 26 L.Ed.2d 68 (1970).

7. In 1968 Handgards filed this antitrust suit against Ethicon under (1) an "overall scheme" theory and (2) a "bad faith" prosecution theory to monopolize the disposable glove market. *See Handgards, Inc. v. Johnson & Johnson,* 413 F.Supp. 921, 923–25 (N.D.Cal.1975). The bad faith prosecution theory was based on Ethicon's Gerard patent infringement suit. Before trial, however, the district judge required that Handgards amend its complaint to include a request to declare the Orsini patent invalid. After the jury's finding that the Orsini patent was not

invalid, Judge Orrick found that the Orsini patent was irrelevant to the antitrust injury caused by Ethicon's bad faith prosecution of the invalid Gerard patent. Thus, the question of the Orsini patent's validity completely dropped out of the antitrust suit. Handgards did not appeal the jury's Orsini patent verdict in *Handgards I,* and it was not raised during the second trial in *Handgards II.*

8. District courts should take special measures to ensure that litigants do not manipulate the jurisdiction of the Federal Circuit:

Federal District judges are encouraged to use their authority under the Federal Rules of Civil Procedure, *see* Rules 13(i), 16, 20(b), 42(b), 54(b), to ensure the integrity of the jurisdiction of the federal court of appeals by separating final decisions on claims involving substantial antitrust issues from trivial patent claims, counterclaims, cross-claims, or third party claims raised to manipulate appellate jurisdiction.

S.Rep. No. 1275, *supra,* at 20, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 30. The district court may also sever the unrelated nonpatent claims from the patent claims under Fed.R. Civ.P. 21. *See* Committee on Patents, *The New Court of Appeals for the Federal Circuit* 749–50 (1983). Such severance practices along with

is a perplexing statute the meaning of which we suspect will become fixed only by means of case-by-case analysis. To observe judicial restraint and decide no more than we must is the appropriate course here.

## III.

### ARE THE JURY FINDINGS PROPERLY SUPPORTED BY THE EVIDENCE

In *Handgards I,* 601 F.2d at 994–96, we held that to establish section 2 liability Handgards had to prove (1) by clear and convincing evidence that Ethicon prosecuted the Gerard patent suit in bad faith;[9] (2) that Ethicon had a specific intent to monopolize the relevant market; and (3) that a dangerous probability of success existed. On appeal, Ethicon argues that it is entitled to judgment as a matter of law and that no substantial evidence supports the jury's finding on each of the section 2 elements.

■ We cannot reverse the jury's finding unless "if, without accounting for the credibility of the witnesses, we find that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party can support one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1026 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). We shall review the evidence under headings corresponding to the issues in which Handgards had the burden of persuasion.

A. *Clear and Convincing Evidence of Bad Faith Prosecution of the Patent Suit*

Handgards presented evidence that Ethicon actually knew that the Gerard patent

was invalid on one or more of three separate grounds. First, it alleged that Ethicon knew that Lyle Shabram, not Gerard (an Ethicon employee), was the first inventor of the plastic glove process. *See* 35 U.S.C. § 102(g) (1982). (The Prior Invention Issue.) Thus, Ethicon fabricated Gerard's invention dates during the patent infringement litigation interrogatories to appear earlier than Shabram's dates of invention. Second, Handgards alleged that even if its dates were correct, Ethicon knew that the patent was invalid under the "on sale" or "in public use" defense because Gerard had sold gloves to A.S. Aloe in 1957, more than one year before he filed a patent application. *See* 35 U.S.C. § 102(b) (1982). (The "On Sale" or "In Public Use" Issue.) Finally, Handgards contends that Ethicon definitely knew of Shabram's prior public use in 1963, and yet it continued to litigate the patent suit through trial and appeal to the Supreme Court. (The Prior Public Use By Shabram Issue.) These theories were asserted to prove that Ethicon prosecuted the patent infringement suit in bad faith in an effort to monopolize the relevant market. We shall evaluate the evidence with respect to each of these theories.

Before doing that, however, we must address some fundamental challenges with respect to the trial court proceedings. Ethicon challenges the district judge's submission of these issues to the jury and his alleged prejudicial conduct toward Ethicon throughout the trial.

■ Ethicon argues that the district judge must make a threshold legal determination whether Handgards had established, by clear and convincing evidence, that the Gerard patent was invalid on the basis of any grounds not previously litigated in the patent suit before submitting such grounds to the jury in the instant case. This is not so. In *Handgards I,* 601 F.2d at 996, we established a clear and convincing evidence

---

explicit findings on whether "arising under" section 1338 jurisdiction exists will ensure "that the tail of a patent issue does not wag the dog of an antitrust issue." Newman, *supra,* at 242. *See also* Lever, *supra* note 3, at 258–65.

**9.** In these cases the anticompetitive conduct directed to accomplishing the unlawful purpose is the bad faith prosecution of the patent infringement suit.

standard for a jury's factual finding of bad faith. We did not establish such a standard for a "threshold legal determination" by a district judge.

■ Ethicon argues that the jury should not have considered the defenses that were not litigated in the original patent suit.[10] We disagree. Ethicon's antitrust liability is premised upon its prosecution of a patent infringement suit with the knowledge that its patent was invalid. *Handgards I*, 601 F.2d at 994. If Ethicon knew that the Gerard patent was invalid under any defense, it is irrelevant that the defense was not litigated in the patent infringement proceeding. All that is required for a finding of bad faith in the context of an infringement suit is that the patent holder, Ethicon, knew that its patent was invalid. The bad faith involved—attempting to enforce a government granted monopoly to which the patent holder knows he has no right—is as much extrinsic to the suit as it is inherent in filing a legal cause of action devoid of merit.

As Ethicon argues, liability cannot be based solely upon the fact that a valid, unlitigated defense existed to its patent infringement claim. Ethicon must also have known that its patent was invalid by reason of that defense. The district court must instruct the jury first on the law governing the various patent defenses. The court must then be careful to instruct the jury that it must find not only the existence of facts which created a valid defense to the patent claim but also that the antitrust defendant knew, during the course of the patent prosecution, that the patent was invalid by reason of that defense. Here, the district court did just this. The district court instructed the jury that first it had to determine the invalidity of the patent on the basis of a particular defense and only then could it determine whether Ethicon knew the patent was invalid on the basis of that defense. Under the facts presented by Ethicon, the Gerard patent could have been invalid under any one of or all of the defenses raised by

Handgards in the antitrust trial. It was up to the jury to decide whether the factual predicates of a defense were present and whether Ethicon actually knew that the patent was invalid on the basis of the defense.

Ethicon also argues that the trial judge's conduct constituted prejudicial error. It contends that the trial judge applied a different set of rules to Ethicon, made hostile comments to Ethicon's counsel, and interrupted Ethicon's direct and cross examination. Thus, Ethicon claims that the judge's actions tainted the jury's impression of Ethicon in a case in which the primary issue was bad faith. Our review of the record leads us to reject this conclusion.

■ Very few cases outside of the criminal law area support an appellate finding of general judicial misconduct during trial. *See* C. Wright & A. Miller, *supra* note 5, § 2809, at 66 (1973 & 1982 Supp.). The standard for reversal is whether the trial was unfair. *See Goldman v. Fenn*, 252 F.2d 47, 48 (1st Cir.1958). The conduct alleged by Ethicon does not rise to the level of "unfairness" required by our prior cases. *See, e.g., Maheu v. Hughes Tool Co.*, 569 F.2d 459, 471–72 (9th Cir.1978) (a trial is unfair when the judge expresses his opinion as to an ultimate issue of fact in front of a jury or argues for one of the parties in the suit). And, no evidence exists to support an inference that the trial judge affected the jury's inquiry into bad faith.

Complex antitrust cases tried before a jury present difficult problems for a trial judge. *See generally* W. Schwarzer, *Managing Antitrust and Other Complex Litigation* (1982). In this case the trial judge limited the trial presentations to four days for each side. Because Handgards completed its case in one half the allotted time, the judge appropriately gave more latitude to its presentation. Ethicon's presentation posed more problems for the court. We find no objection to the judge's conduct

---

**10.** We refer to these defenses as "unlitigated defenses" or "unlitigated patent defenses."

during trial. No error exists. We now turn to Handgards' three theories.

### 1. The Prior Invention Issue

During the second trial, Handgards focused its presentation on the facts showing that by 1964 Ethicon had acquired sufficient information to indicate with certainty that the Gerard patent was invalid on the basis of Shabram's prior invention. Handgards asserted that instead of abandoning the suit, Ethicon in 1967 fabricated a date earlier than that of Shabram's invention in response to Handgards interrogatories. To support its allegations, Handgards introduced evidence that Gerard discovered the use of paper as a backing and carrier on May 24, 1957, and did not solve the sticking problem until November 1957. This evidence, which consisted of Gerard's communications to his patent attorney in 1958 and Gerard's sworn depositions taken in 1959, directly conflicted with Ethicon's interrogatory answer in 1967 that Gerard had developed the process in 1956.

■ Ethicon attempts to counter this proof in several ways. First, it argues that because Handgards did not attempt to prove that Shabram was a prior inventor, it cannot claim that Ethicon should have known that the Gerard patent was invalid on the basis of section 102(g).[11] This is incorrect. Handgards did offer proof of both Shabram and Gerard's dates of conception and reduction to practice. It is Ethicon that failed to present evidence that would have questioned Shabram's dates of invention or conception. In fact, Handgards presented a former employee of Ethicon, Mr. Baab, who testified that Gerard, an employee of Ethicon, had told him that the Gerard patent was invalid on the basis of Shabram's prior art. Ethicon vigorously objects to the introduction of this evidence. It contends that the relevant inquiry is

whether Ethicon's attorney knew of the prior invention, not Gerard. We disagree. It is true that Handgards had to prove that the agents, officers, and directors of Ethicon responsible for prosecuting and maintaining the suit were in possession of facts that prevented them from holding a good faith belief that the Gerard patent was valid. However, evidence that the inventor/patentee/employee knew the patent was invalid is very probative of Ethicon's knowledge. *Cf. W.R. Grace & Co., Inc. v. Western U.S. Industries, Inc.*, 608 F.2d 1214, 1218–19 (9th Cir.1979), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2920, 64 L.Ed.2d 810 (1980). We refuse to establish a requirement that Handgards had to prove that the patent attorney knew the Gerard patent was invalid.

■ Second, Ethicon argues that the district court erred by allowing Handgards' expert to testify on Gerard's reduction to practice date. We disagree. "The trial court is vested with broad discretion concerning the admissibility or exclusion of expert testimony and the court's action is to be sustained unless shown to be manifestly erroneous." *Reno-West Coast Distribution Co., Inc. v. The Mead Corp.*, 613 F.2d 722, 726 (9th Cir.), *cert. denied*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 183 (1979). The presentation of an expert's testimony was entirely appropriate to show the facts necessary for a reduction to practice.

■ Third, Ethicon argues that Gerard's invention was reduced to practice in September 1956. It contends that the fact that the paper backing had not been discovered until May 1957 did not prevent a reduction to practice in 1956. Handgards, however, argues that the paper carrier distinguished Gerard's invention from the prior art. Handgards also introduced evidence that

---

11. Ethicon also contends that when Shabram abandoned his interference proceeding, under established patent law he conceded priority of invention. *See* 35 U.S.C. § 135 (1982); 37 C.F.R. § 1.262(b) (1982). We disagree. Although it is true that an abandonment of an interference proceeding operates as an adverse award of priority, we do not believe this patent rule was intended to determine whether a party knew that its patent was invalid because of prior invention. To determine this actual knowledge, we must allow Handgards to present evidence of Shabram's priority.

Gerard's patent counsel and Johnson & Johnson's in-house patent counsel accepted a November 1957 reduction to practice date on the basis that the paper sticking problem (an essential element of the invention) had been solved. We believe that under these circumstances the district judge properly left the evidence for the jury to determine the date on which Ethicon believed that Gerard had reduced his invention to practice.

■ Finally, Ethicon argues that Handgards cannot attack Gerard's reduction to practice date because during the patent trial Handgards accepted the date by stipulation and during the second antitrust trial Handgards conceded that Ethicon's interrogatory answer had not prejudiced its patent trial. We disagree. A stipulation of a fact in a patent trial in which the fact was not necessary to prove the defense that was going to be litigated cannot bind Handgards in a subsequent antitrust trial in which Handgards attempts to prove that Ethicon's answer to the interrogatory was knowingly falsified. After all, it is Ethicon's bad faith in the patent trial that is at issue; thus, Handgards must be allowed to challenge the interrogatory answer. Our review of the record convinces us that the Gerard reduction to practice issue was properly submitted to the jury.

2. *The "On Sale" or "In Public Use" Issue*

■ Under 35 U.S.C. § 102(b) (1982), if Gerard placed his invention "on sale" or "in public use," he had one year to file for a patent. Because Gerard filed for a patent on June 2, 1958; the invention could not have been "on sale" or "in public use" prior to June 2, 1957, for his patent to be valid. Handgards introduced evidence that on May 28, 1957, Gerard had sold one gross of gloves and had taken an order for seventy-two gross from A.S. Aloe. This could be viewed as having invalidated the patent.

To avoid this result, Ethicon in the patent case argued that the first sale did not occur until November 24, 1957. However, if this was the crucial date with respect to the

patent's validity, Ethicon is confronted with two damaging consequences. Shabram's prior invention would invalidate Ethicon's patent, *see infra* pp. 1291–1293, and the November 24, 1957 date is inconsistent with Ethicon's assertion in 1967 that the Gerard process was developed in 1956. *See supra* pp. 1289–1290.

On the other hand, were 1956 the crucial date the issue whether Gerard placed his invention "on sale" or "in public use" prior to June 2, 1957 becomes critically important. For this reason the A.S. Aloe transaction must be considered. It was quite proper for the jury to have been given the opportunity to consider these alternatives although this involved submission to the jury of defenses not previously litigated in the patent suit.

Ethicon also argues that the Gerard patent covered the process of making the gloves, not the product (gloves), thus the Aloe transaction could not invalidate the patent. We disagree. The district judge's jury instruction combined the "on sale" and "in public use" defenses because the Aloe transaction raised a possibility that the patent was invalid under either. Although it is clear that the "on sale" and "in public use" defenses are separate, many courts have evaluated them together. *See, e.g., Dart Industries, Inc. v. E.I. Du Pont De Nemours and Co.*, 489 F.2d 1359, 1364–65 (7th Cir.1973), *cert. denied*, 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974). This is entirely appropriate in cases in which the product of the process is sold. *See Powell Manufacturing Co. v. Long Manufacturing Co.*, 319 F.Supp. 24, 44 (E.D.N.C.1970), *aff'd*, 171 U.S.P.Q. 328 (4th Cir.1971); *Kalvar Corp. v. Xidex Corp.*, 556 F.2d 966 (9th Cir.1977). In such cases the sale of a product before the critical date will invalidate the process patent under the "in public use" defense. *See Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516 (2d Cir.), *cert. denied*, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946). Courts also have found that a sales solicitation that involved the display of operable samples of the invention constituted

placing the invention "on sale" even when production models were not available for delivery. *See, e.g., Amphenol Corp. v. General Time Corp.*, 397 F.2d 431, 436–37 (7th Cir.1968); *J.L. Clark Manufacturing Co. v. American Can Co.*, 256 F.Supp. 719, 730–35 (D.N.J.1966). Thus, the Aloe transaction could have invalidated the patent even if the process, not the product, was the object of the patent.

Ethicon also argues that the Aloe transaction falls within the experimental use exception to section 102(b) as a matter of law. We disagree. Handgards presented evidence that Gerard had stated that the Aloe transaction was a commercial sale and for purposes of generating orders. Although Ethicon contested this evidence, it did not introduce such evidence that would require us to grant an experimental use exception as a matter of law. The issue was properly before the jury.

Finally, Ethicon contends that its reliance on patent counsel precludes a finding of bad faith based on the "on sale" or "in public use" defenses. However, Handgards presented evidence that showed Gerard had knowledge of the prior delivery and order to Aloe, and that Ethicon also was aware of this transaction. Thus, if the jury found the patent invalid by reason of the transaction, this knowledge could support a finding of bad faith.

### 3. *The Prior Public Use by Shabram Issue*

The prior public use by Shabram defense was litigated in the patent trial.[12] Using a "beyond a reasonable doubt" standard, Judge Burke found the Gerard patent invalid because of Shabram's prior use. Handgards presented the testimony of Mr. Baab, who said that Gerard had told him that he had purchased a glove prior to his invention. To support its allegation of

Ethicon's bad faith prosecution, Handgards showed that during the patent trial, Shabram's testimony was corroborated by five witnesses. Ethicon, on the other hand, produced no evidence in the patent trial directly contradicting this testimony. Yet, it continued to litigate the patent through the Supreme Court's denial of certiorari.

Ethicon primarily argues that its patent counsel disbelieved Shabram and his witnesses. It points to prior inconsistent statements by Shabram and his self-interest as the alleged prior inventor to support its right to contest his testimony. Ethicon also quotes from this court's decision affirming Judge Burke with the caveat that the decision "could have been decided either way." *Ethicon, Inc. v. Handgards, Inc.*, 432 F.2d 438, 438 (9th Cir.1970), *cert. denied*, 402 U.S. 929, 91 S.Ct. 1525, 28 L.Ed.2d 863 (1971). Ethicon therefore argues that this evidence should bar Handgards from relitigating the issue in this antitrust case. We disagree. Our review of the record indicates that Handgards' evidence of Gerard's knowledge of prior use requires that this issue go to the jury.[13] This evidence was not available in the patent suit; thus, both the district court and the circuit court's opinions should not bar litigation of this issue for the first time. The district court properly instructed the jury that the fact that Ethicon lost the prior suit did not establish that it was brought in bad faith. The jury had to determine whether Ethicon initiated or pursued the infringement suit against Handgards knowing that the patent was invalid.

### 4. *Conclusion as to the Clear and Convincing Evidence of Bad Faith*

Our examination of the record convinces us that the district court properly instructed the jury in accordance with our opinion in *Handgards I*. The jury was

---

12. Ethicon argues that Handgards conceded the use of Shabram's prior public use as a basis for bad faith prosecution. This is not supported by the record. The district judge clearly instructed the jury as to the law on this defense.

13. Ethicon also argues that Gerard's alleged expressions of opinion should not be imputed to the corporation. As stated before, Gerard's involvement in both the invention and subsequent production of plastic gloves requires that this testimony go to the jury.

instructed that a patent is presumptively valid and that presumption can only be rebutted with clear and convincing evidence. *See* 601 F.2d at 996. Substantial evidence exists to support a finding by the jury that Handgards established such a rebuttal and that Ethicon prosecuted its patent suit in bad faith.

### B. *Specific Intent to Monopolize the Relevant Market*

■ Ethicon argues that its repeated attempts to license both the Gerard and the Orsini patents preclude a finding of a specific intent to monopolize as a matter of law. It contends that Handgards refusal to negotiate prevents it from now challenging the terms of the license offers as unreasonable. We disagree. Handgards presented substantial evidence to support the jury's finding of specific intent.

Courts have used the requirement of specific intent "to confine the reach of an attempt claim to conduct threatening monopolization." *William Inglis*, 668 F.2d at 1027 (citations omitted). An antitrust plaintiff can establish the existence of specific intent not only by direct evidence of unlawful design, but by circumstantial evidence of illegal conduct. *Id.* Thus, as we said in *Handgards I*, 601 F.2d at 993 n. 13, "[t]he requisite intent to monopolize in this case could be inferred from the finding of bad faith." Substantial evidence exists to support such an inference.

Handgards presented evidence that once it had become a viable competitor with twenty-five percent of the market in 1964, Ethicon took steps to eliminate competition from the relevant market. The most damaging evidence introduced was a letter written by Gerard, an Ethicon employee, to Sam Porter, a major distributor and potential joint venturer of hair care gloves. This letter asserted the validity of Ethicon's Gerard patent and the company's intent to enforce the patent.[14] After the letter was received, Porter stopped purchasing gloves from Handgards and refused to negotiate any joint venture with Handgards. Ethicon also sent a similar letter to several other purchasers of hair care gloves. This evidence along with the prosecution of a bad faith patent suit provides a sufficient basis for a jury's finding of specific intent to monopolize. Ethicon's argument that its repeated license offers negated this intent was presented to and rejected by the jury. The mere existence of license offers does not require that we ignore the strong evidence presented by Handgards which supports the jury's finding.[15]

### C. *Dangerous Probability of Success Within the Relevant Market*

■ Ethicon argues that Handgards' failure to prove actual exclusion of competition from any market prevents a finding of a dangerous probability of success. We have never established an actual exclusion

---

**14.** Gerard wrote:

If you will read this patent, you will find that anyone manufacturing plastic gloves on paper are in violation. At this time, we have a patent infringement trial upon the Federal Court calendar in the Northern Jurisdiction of California.

I can assure you that this patent is enforceable or Ethicon would never have purchased it from me at the cost they paid without first investigating it very thoroughly. I can also assure you that our legal department intends on enforcing this patent.

**15.** Ethicon's argument that Handgards should have accepted its license offer on both patents, and subsequently sued for an antitrust violation is not convincing. At the time Ethicon offered the patent licenses, the law of "license estoppel"

was unclear. *See Lear, Inc. v. Adkins*, 395 U.S. 653, 661–68, 89 S.Ct. 1902, 1906–10, 23 L.Ed.2d 610 (1969). Thus, the existence of the license may have prevented a subsequent challenge of the patent's validity. This uncertainty also was aggravated by the fact that Handgards had not fully developed its theory to challenge Ethicon's conduct. Handgards acceptance of the licenses may have precluded certain avenues of relief. *See, e.g., Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). Given this situation, a license offer should not preclude as a matter of law a finding of intent to monopolize. It was proper for the jury to consider Ethicon's offers and Handgards refusal to negotiate. The jury also properly evaluated Handgards' evidence that the license offers were unreasonable.

requirement.[16] A jury may infer a dangerous probability of success "either (1) from direct evidence of specific intent plus proof of conduct directed to accomplishing the unlawful design, or (2) from evidence of conduct alone, provided the conduct is also the sort from which specific intent can be inferred." *William Inglis*, 668 F.2d at 1029 (footnotes omitted). Of course, proof of direct market power on the part of the defendant tends to support a finding of a dangerous probability of success.

In this case Handgards presented evidence showing that Ethicon controlled ninety percent of the relevant market of hair care gloves and that no competition emerged until the district court declared the Gerard patent invalid. Although Ethicon disputes this evidence, no facts have been presented that would require a reversal of the jury's finding.[17] Handgards' evidence has met our requirement of proof "that the defendant patentee possessed or threatened to possess an ability to lessen competition in the relevant market." *Handgards I*, 601 F.2d at 993 n. 13.

## IV.

### THE *NOERR-PENNINGTON* ISSUE

 The *Noerr-Pennington* doctrine recognizes an immunity from antitrust liability rooted in the recognition of fundamental civil rights. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). "Under the *Noerr-Pennington* doctrine, bona fide efforts to obtain or influence legislative, executive, judicial or administrative

actions are immune from antitrust liability [on the basis of the first amendment's guaranteed right to petition]." *Clipper Exxpress v. Rocky Mountain Motor Tarriff Bureau, Inc.*, 690 F.2d 1240, 1251 (9th Cir.1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). However, the immunity does not extend to so-called "sham proceedings," which were instituted without probable cause and in complete disregard of the law to interfere with the business relationships of a competitor. *Id.* at 1251–54; *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The justification for the doctrine does not exist under such circumstances. Ethicon argues that the district court's refusal to instruct the jury on *Noerr-Pennington* immunity and to require a finding of a sham proceeding deprived it of access to the antitrust immunity and thus constituted reversible error. We disagree.

In *Clipper Exxpress* we held that to invoke the sham exception to *Noerr-Pennington* immunity the plaintiff must prove that the defendant's litigation of baseless claims constituted some abuse of process. 690 F.2d at 1259. We believe that *Handgards I* established a standard that embodies both the *Noerr-Pennington* immunity and the sham exception. There we held that "the jury should be instructed that a patentee's infringement suit is presumptively in good faith and that this presumption can be rebutted only by clear and convincing evidence [of bad faith]." 601 F.2d at 996. The good faith presumption affords the equivalent of the *Noerr-Pennington* immunity while the requirement of bad faith litigation easily affords the equivalent of the sham exception. *See R.*

16. Ethicon's citation to *Carpet Seaming Tape Licensing Corp. v. Best Seam, Inc.*, 694 F.2d 570, 580 (9th Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983), does not support its actual exclusion argument.

17. Ethicon also argues that the relevant market of heat sealed gloves sold to hair care kit manufacturers is improper as a matter of law. We disagree. We have said repeatedly that the definition of a relevant market is an issue of fact for

the jury. *See, e.g., Greyhound Computer Corp., Inc. v. International Business Machines Corp.*, 559 F.2d 488, 493–96 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). Thus, the jury's finding will not be disturbed unless it is unsupported by substantial evidence. In this case substantial evidence exists to support a jury's finding that excluded other gloves (e.g., industrial, household) from a definition of the relevant market.

Bork, *The Antitrust Paradox* 354 (1978) ("Certainly, in a proper case, a proved intent not to bar competitors from the courtroom but, by litigation of baseless claims, to bar them from a market or to delay their entry should suffice for a violation of the Sherman Act."). Thus, to require a jury instruction as to *Noerr-Pennington* immunity and the sham exception would be duplicative.[18] *See Handgards I,* 601 F.2d at 995 n. 16.

## V.

## THE ANTITRUST STANDING OF HANDGARDS

In order to receive treble damages under 15 U.S.C. § 15 (1982), Handgards must prove that it has been injured by reason of a violation of the antitrust laws. The Supreme Court recently observed that the question of antitrust standing "requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983). The Supreme Court articulated six factors that should be considered in determining whether a plaintiff has antitrust standing:

(1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicate recoveries or complex damage apportionment.

18. Ethicon argues that the existence of nonlitigated defenses cannot render a patent suit a sham under this circuit's *Noerr-Pennington* precedent. We disagree. If Ethicon knew that the Gerard patent was invalid under a defense, it is irrelevant that the defense was not litigated in the patent infringement suit. All that is required for a finding of bad faith is the fact that the suit should have never been brought at all.

*McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1374 (8th Cir.1983) (citing *Associated General Contractors,* 103 S.Ct. at 908–12), *cert. pending,* 52 U.S.L.W. 3792 (1984). Because these factors focus upon the relationship between the type of injury for which damages are sought and the harmful conduct, we shall examine the relationship between each of Handgards' damage elements and the harmful conduct.

A. *Handgards' Lost Profits as a Result of the Pendency of the Bad Faith Litigation*

The jury awarded Handgards lost profits as a result of the pendency of the bad faith litigation from 1964 to 1973. To justify such an award, Handgards had presented evidence to support all six factors of "antitrust standing" required by *Associated General Contractors.*[19] Ethicon directly attacks the jury's finding that the lost profits injury was of a type that Congress sought to redress with the antitrust laws. It presents three arguments to support its contention that no antitrust injury exists.

First, Ethicon argues that its license offers to Handgards on both the Gerard and Orsini patents preclude a finding of antitrust injury. *See LaSalle Street Press, Inc. v. McCormick and Henderson, Inc.,* 445 F.2d 84, 95–96 (7th Cir.1971). In *LaSalle,* however, the trial court had made an explicit finding that the patent infringement action was brought in good faith. *Id.* at 96. Thus, efforts to settle through the sale of a license precluded a counterclaim for antitrust injury. Here, Ethicon brought a bad faith infringement suit. Any offer to license a patent that it knew was invalid cannot preclude a finding of antitrust injury as a matter of law. As

19. Handgards introduced evidence of (1) Ethicon's prosecution of the Gerard patent suit and its effect of excluding Handgards from the relevant market; (2) Ethicon's bad faith; (3) the anticompetitive effect of Ethicon's conduct and its "antitrust injury"; (4) the direct impact of the bad faith patent infringement suit; (5) damages supported by schedules and expert testimony; and (6) an appropriate damages apportionment to exclude the effect of the valid Orsini patent when necessary.

noted before, the license offers were admissible to prove good faith on Ethicon's part for the purpose of determining intent to monopolize. *See supra* note 15. Apparently, the jury chose either not to believe the evidence as to the specific terms of the license offer or to give it the weight sought by Ethicon. Ethicon's attempt to argue the so-called doctrine of avoidable consequences [20] should have been directed toward reducing the amount of damages not the existence of an antitrust injury.[21]

Second, Ethicon argues that Handgards' alleged lost profits are attributable to the entry of additional competition, not an antitrust injury. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). To have earned the alleged profits, it contends that Handgards would have had to exclude two subsequent competitors, Poly-Version and Clairol, from the relevant market. We disagree. The district judge explicitly instructed the jury that Handgards could not recover for losses resulting from an increase in competition. Also, as Handgards points out, Poly-Version did not become a viable competitor until 1971 when it entered into a joint venture with Clairol. Handgards does not seek Poly-Version's profits from the joint venture. It only looks to these profits as a rational method of calculating profits Handgards would have received had Ethicon not stopped its efforts to form a joint venture in 1965 and 1968. Aside from the lost joint venture business, Handgards presented evidence

that the Gerard patent suit impaired significantly its ability to raise capital to remain "technologically competitive" and Ethicon's letter to Handgards' potential customers frightened many of them away.

■ Ethicon's conduct not only damaged Handgards but it also had an anticompetitive effect. *See California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 732 (9th Cir.1979). The bad faith suit not only excluded Ethicon's only significant competitor, Handgards, it also checked possible future competitors until the Gerard patent had been declared invalid. Although subsequent to that date several competitors entered the market, that did not alleviate the harm to competition that resulted from the prosecution of a suit for a patent that was known to be invalid. We conclude, therefore, that Handgards' lost profits injury meets the *Brunswick* test: "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." 429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original).[22]

Finally, Ethicon argues that the injury caused by the Orsini patent is not antitrust injury. We agree. However, this does not help Ethicon. There is no showing that Handgards' lost profits are attributable to the Orsini patent. Ethicon did not attempt to prove that the Orsini patent caused any of the damages.[23] The evidence was to the

**20.** Under that doctrine, Ethicon argues that had Handgards accepted its licenses, it would have prevented the antitrust injury. *See supra* note 15.

**21.** Ethicon also argues that Handgards abandoned its sales to the hair care market as a business decision after the Gerard patent was invalidated. Handgards vigorously countered this argument. We believe that the jury's resolution of this factual dispute is supported by the evidence.

**22.** In *Handgards I*, 601 F.2d at 997, we questioned the trial court's charge concerning the damages available to the plaintiff for lost profits. Our review of the jury instructions in the second trial leads us to conclude that the district

court properly interpreted *Brunswick* in the context of lost profits.

**23.** Ethicon argues that Handgards' resubmission of the identical damage schedule proves that the damages caused by the Orsini and Gerard patents are identical. This argument is based on the fact that in the first antitrust trial Handgards claimed that the Orsini patent was also invalid. We disagree. In the first trial Judge Orrick required that Handgards request a declaration of invalidity of the Orsini patent. After the jury's finding that the Orsini patent was not invalid, he found that the Orsini patent was irrelevant to the injury caused by the Gerard patent litigation. We agree. Thus, Handgards' use of the same damages schedule was proper.

contrary. Ethicon based its patent infringement suit against Handgards solely on the Gerard patent. The Ethicon letters to Handgards' potential customers also explicitly mentioned only the Gerard patent. Furthermore, Handgards introduced evidence that customers refused to deal with it because of Ethicon's Gerard patent suit. The jury's verdict must be sustained.

B. *The Legal Expenses, Attorneys' Fees, and Costs Incurred in Defending the Gerard Patent Infringement Litigation*

Ethicon does not challenge the jury's award of damages for the costs incurred to defend its Gerard patent suit. This is because in *Handgards I,* 601 F.2d at 997, we found that "[i]n a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of the prior patent infringement suit are an injury which 'flows' from the antitrust wrong." We do not believe this conclusion is affected by the antitrust standing principles enunciated in *Associated General Contractors,* 103 S.Ct. at 908–12.

## VI.

## DAMAGE AWARD PROPERLY SUPPORTED BY EVIDENCE

■ Ethicon argues that Handgards' damage schedules are insufficient as a matter of law. We disagree. Once the fact of antitrust injury is proven, we have traditionally required a lesser quantum of proof to support the amount of damages. *See Blanton v. Mobil Oil Corp.,* 721 F.2d 1207, 1215–16 (9th Cir.1983), *cert. pending,* 53 U.S.L.W. 3022 (1984). An antitrust plaintiff must simply provide evidence to support a " 'just and reasonable estimate of the damage.' " *Pacific Coast Agricultural Export Assoc. v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1207 (9th Cir.1975) (quoting *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). A jury's finding of the amount of damages must be

upheld unless the amount is "grossly excessive or monstrous," clearly not supported by the evidence, or "only based on speculation or guesswork." *Blanton,* 721 F.2d at 1216 (citations omitted). In this case Ethicon has failed to demonstrate such error in the jury's damage verdict.

A. *Damages for Lost Profits*

At trial, Handgards presented evidence to support its claim that it lost $3,297,122 in profits between 1964 and 1973 as a result of Ethicon's conduct. The jury awarded the entire amount to Handgards. On appeal, Ethicon advances four contentions challenging the proof of damages as insufficient as a matter of law. First, Handgards failed to allocate lost profit damages attributable to the valid Orsini patent. Second, the damage schedules assumed an unsupported fifty percent market share for Handgards. Third, Handgards used an unsupported thirty-five to forty percent profit margin to compute its lost profits. Finally, the 1964 to 1973 period chosen for lost profits was arbitrary.

Each of these contentions was presented to and rejected by the jury. In light of the liberal proof of damages standard in antitrust cases, Ethicon does not demonstrate an error that would take the jury's verdict out of the range of a "just and reasonable estimate of the damages." Ethicon's strategic decision not to provide an alternative and tangible basis for calculating damages undoubtedly weakened its position. On appeal, we cannot speculate whether such an alternative schedule might have been more reasonable under the circumstances. *Cf. D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co.,* 692 F.2d 1245, 1249 (9th Cir. 1982); *Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 836–37 (9th Cir.1982).

B. *Damages for Costs Incurred in Defending the Gerard Patent Suit*

Handgards presented evidence that it expended $225,000 in attorneys' fees and $85,000 in executive time to defend against the Gerard patent infringement suit from

1962 to 1971. The attorneys' fees amount, however, included money spent to defend against both the Gerard and the Orsini patents. Because Ethicon eventually prevailed on the Orsini patent, the district court properly instructed the jury to award only the amount related to the Gerard patent defense. Handgards revised its attorneys' fees damage claim to $205,000 and the entire amount was awarded by the jury. On appeal, Ethicon argues that the amount allocated to the Gerard patent was unsupported by the evidence. We disagree.

It is true that Handgards only presented recently prepared schedules of the attorneys' fees to show that it had expended $20,000 of $225,000 on the Orsini patent issue. It did so because the actual time sheets were accidently destroyed by the patent counsel's widow. Ethicon argues that the destruction of the best evidence along with Handgards counsel's prior statements charging $180,000 to the Orsini patent require the district court to dismiss the damages claim. Handgards responded by alleging that its current estimates were based on previously prepared monthly statements. It was only the daily time sheets that were destroyed. And, it acknowledged that its new antitrust counsel, who was unfamiliar with the case, made prior estimates that were unfounded. To support its figures, Handgards argued that the Orsini patent issue was dropped before it got to the discovery stage during the patent litigation.

The district court viewed Ethicon's objection at trial as an attack only on the reliability of Handgards' evidence, not its admissibility. Therefore, the jury was instructed to weigh both Ethicon and Handgards' estimates to arrive at the proper figure. We believe that this approach was proper. Courts faced with similar issues have normally left the effect of the destruction up to the jury. *McCormick on Evidence* § 273, at 809–10 (E. Cleary 3d ed. 1984). *See generally* Oesterle, *A Private Litigant's Remedies for an Opponent's Inappropriate Destruction of Relevant Documents,* 61 Texas L.Rev. 1185, 1221–39 (1983) (discussing sanctions imposed during affected litigation). Thus, we affirm the jury's verdict of damages awarded for defense of the Gerard patent suit.

## VII.

### POST–JUDGMENT INTEREST

Relying on 28 U.S.C. § 1961 (1982), the district court awarded interest to Handgards on the amount of the first judgment from its date of entry in 1976. *See Handgards II,* 552 F.Supp. at 821–22. On appeal, Ethicon argues that post-judgment interest should apply only from the date of the second judgment whenever the first judgment is reversed and remanded. We disagree. Under a de novo standard of review,[24] we affirm the district court's award of post-judgment interest.

The district court relied on *Mt. Hood Stages, Inc. v. The Greyhound Corp.,* 616 F.2d 394, 406 (9th Cir.), *cert. denied,* 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1980), and *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1310 (9th Cir.), *cert. denied,* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982), to support its post-judgment interest award. *See Handgards II,* 552 F.Supp. at 821.[25]

---

24. Our standard of review is de novo because this issue requires an interpretation of the "date of the entry of the judgment" under 28 U.S.C. § 1961 (1982). *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1310 (9th Cir.), *cert. denied,* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982).

25. The district court's policy analysis appears to adopt a mandatory award of interest from the first judgment in all cases:

> A plaintiff's right to post-judgment interest should not hinge on the fortuity that on remand the finder of fact will award the *exact* amount of damages awarded at the first trial. Furthermore, if interest is not allowed on the first judgment from the date of its entry simply because the first and second judgments are not for the same amount, then a successful plaintiff could be penalized for receiving a second judgment larger than the first judgment.

Under *Mt. Hood Stages* and *Twin City Sportservice*, a district court must award interest for the original vacated judgment even when "the issue of antitrust liability was not firmly settled until the post-remand judgments, both of which were entered after additional factual inquiry. In both cases [*Mt. Hood Stages* and *Twin City Sportservice*], it can be said that the second judgment 'remains the same—in the same amount, for the same damages incurred during the same period.'" *Twin City Sportservice*, 676 F.2d at 1311 (citing *Mt. Hood Stages*, 616 F.2d at 407). Accordingly, we reject the assertion that under the circumstances of this case the first judgment cannot establish the date of liability.[26]

Ethicon is on somewhat more solid ground when it contends that no post-judgment interest is available because upon remand, the jury returned a larger verdict than that awarded in the first trial.[27] Dicta in a recent Ninth Circuit decision supports Ethicon's argument:

Of course, in those cases where an earlier judgment in favor of plaintiff is vacated on appeal and a new verdict or decision for plaintiff is rendered in the district court on remand, interest under section 1961 should properly run only from the date of entry of the new judgment and not from that of the old judgment since the new verdict or decision presumably will include the value of loss of use of the money judgment from the date of loss up to the date of the new verdict on remand.

*Turner v. Japan Lines, Ltd.*, 702 F.2d 752, 757 n. 7 (9th Cir.1983). We decline to interpret *Japan Lines'* dicta as an attempt to formulate a general rule for all cases. Such an interpretation would be inconsistent with the reasoning supporting *Japan Lines'* holding and result.

Interest compensates an injured party "for the deprivation of the monetary value of his loss from the time of the loss to the payment of a money judgment." Comment, *Interest on Judgments in the Feder-*

*Handgards II*, 552 F.Supp. at 822 (emphasis in original). We do not believe this analysis properly articulates the test for post-judgment interest when the second judgment is larger than the first.

**26.** To support its argument, Ethicon relies on *Ashland Oil, Inc. v. Phillips Petroleum Co.*, 607 F.2d 335, 336 (10th Cir.1979) (holding that interest allowed only from date of second judgment when new award of damages based on "additional facts" determined on remand), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980), and *Hysell v. Iowa Public Service Co.*, 559 F.2d 468, 476–77 (8th Cir.1977) (holding that interest allowed only from date of second judgment when first judgment vacated on appeal). Although these cases were cited in dicta by this court in *Turner v. Japan Lines, Ltd.*, 702 F.2d 752, 754 (9th Cir.1983), an earlier Ninth Circuit case had expressly disapproved of their reasoning to the extent it varied with this circuit's precedent. *See Mt. Hood Stages, Inc. v. The Greyhound Corp.*, 616 F.2d 394, 407 (9th Cir.), *cert. denied*, 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1980). To hold *Ashland Oil* and *Hysell* applicable here would overrule *Mt. Hood Stages* and *Lew Wenzel & Co. v. London Litho Supply Co., Inc.*, 563 F.2d 1367 (9th Cir.1977). *Japan Lines'* attempt to reconcile post-judgment interest law in all of the circuits cannot be viewed as overruling this circuit's prior precedent.

**27.** Ethicon cites *United States v. Hougham*, 301 F.2d 133, 134–35 (9th Cir.1962) to support its argument. In *Hougham* the plaintiff sought post-judgment interest on the additional damages awarded in the second judgment from the date of entry of the first judgment. We held that "post-judgment interest should be calculated from the date of the entry of the judgment in which the money damages, upon which interest is to be computed, were in fact awarded." *Id.* at 135. Because the additional damages were actually awarded in the second judgment, interest could not be calculated from the date of entry of the first judgment. However, *Hougham* did not address the question whether interest from the entry of the first judgment is available to the extent of the original amount when the second judgment is higher. *Cf. Turner v. Japan Lines, Ltd.*, 702 F.2d 752, 755 n. 3 (9th Cir.1983).

Ethicon also relies on cases that have narrowly interpreted section 1961's "entry of the judgment" language. *See, e.g., Harris v. Chicago Great Western Railway Co.*, 197 F.2d 829, 836 (7th Cir.1952); *Powers v. New York Central Railroad Co.*, 251 F.2d 813, 818 (2d Cir.1958). This court in *Japan Lines* expressly rejected these cases and instead adopted the Fifth Circuit's "equitable" construction of section 1961. *See* 702 F.2d at 754–55.

*al Courts*, 64 Yale L.J. 1019, 1019 (1955). Normally, there are two components of the total interest amount. The first component is the interest from the date of the loss to the date of the judgment. This element can be viewed as either interest or damages. It is generally awarded as prejudgment interest or a portion of the continuing damages up to the time of the judgment.[28] The second component is the interest from the date of judgment to the date that the damages are actually paid. This amount is awarded as post-judgment interest under 28 U.S.C. § 1961 (1982). When there are two judgments for a plaintiff, interest from the date of, and on the amount of, the first judgment also can be viewed as either interest or damages. If the second judgment includes as damages such an amount, post-judgment interest on the amount of the first judgment is not recoverable. It has already been accounted for as damages. Where, however, it has not been included in damages, it can be recovered as post-judgment interest. Thus, we must carefully examine the damages sought in the second trial.

During the second trial, Handgards alleged two sources of damages: the legal expenses, attorneys' fees, and costs incurred for the defense of the bad faith patent suit and lost profits resulting from Ethicon's conduct. The time period during which these damages were incurred ended prior to the start of the first trial; therefore, the second jury verdict could not include any element of damages for any conduct between the first and the second judgment. Also, our review of the record has not uncovered evidence or a jury instruction that would support the jury's consideration of the time value of money between the first and second judgments. We can only assume that no part of the additional award included in the second judgment is attributable to post-judgment interest. Thus, Handgards is entitled to "post-first-judgment" interest on the amount of the first judgment from the date of its entry to the date of its payment.

## VIII.

### CONCLUSION

Our review of the record leads us to conclude that the district court properly adhered to our decision in *Handgards I*. Ethicon's arguments on appeal primarily are an attack on the verdict of the jury. As we have noted many times, "Neither the district court nor this court is free to weigh the evidence or reach a result that it finds more reasonable as long as the jury's verdict is supported by substantial evidence." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1026 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). The verdict is supported by substantial evidence. Thus, we affirm the entirety of the antitrust verdict against Ethicon. In addition to the district court's award, Handgards is entitled to its costs and reasonable attorneys' fees for this appeal.

AFFIRMED.

---

**28.** Prejudgment interest is usually provided by statute for liquidated claims from the date the claim becomes due until the entry of judgment. For example, if a contract provides for liquidated damages, in most states the injured party can collect the liquidated sum and an amount for interest from the date of breach to the date of judgment. In direct contrast unliquidated claims typically reflect prejudgment interest only by way of damages that continue to accrue until the date of judgment. For example, the amount of tort damages for emotional distress is fixed at the time of judgment. Any award for the loss of the use of money is presumably reflected in the judgment. Because the amount of damages is not fixed until judgment, it is usually not possible to calculate formally prejudgment interest.

In this case Handgards had an unliquidated antitrust claim that was not fixed in amount until the first judgment. Once it was fixed, Handgards was entitled to interest on the amount originally determined from the first judgment to the extent it was affirmed by the second judgment.