**BUEHLER AG, and Buhler, Inc., Plaintiffs,**

v.

**OCRIM, S.P.A., Ocrim America, Inc., and Farmers Elevator of Dawn, Inc. d.b.a. Panhandle Milling Company, Defendants.**

Civ. No. 3:90–CV–0771–H.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 6, 1992.

Van Jackson Hooker, Jay Vogelson, David A. Klingler, Stutzman & Bromberg, Dallas, TX, Gerald H. Kiel, Julius Fisher, William J. Sapone, McAulay Fisher Nissen Goldberg & Kiel, New York City, for Buehler AG and Buhler, Inc.

Charles Martin Hosch, John Morant Cone, Strasburger & Price, Dallas, TX, M. Lawrence Olivero, Therese A. Hendricks, Wolf Greenfield & Sacks, Boston, MA, for Farmers Elevator of Dawn, Inc. dba Panhandle Milling Co., Ocrim America, Inc.

John Morant Cone, Strasburger & Price, Dallas, TX, M. Lawrence Olivero, Therese A. Hendricks, Wolf Greenfield & Sacks, Boston, MA, for Ocrim, S.p.A.

Maxel (Bud) Silverberg pro se.

## MEMORANDUM OPINION AND ORDER

SANDERS, Chief Judge.

Before the Court are the following sets of motions:

(1) Defendants' Motion for Partial Summary Judgment of Invalidity and Unenforceability of U.S. Patent No. 4,442,980 (Failure to Disclose PXC–M121 as Best Mode and Prior Art) and supporting memorandum, filed March 16, 1992; Plaintiffs' Opposition to Defendants' Motion, filed April 6, 1992; Defendants' Reply, filed April 16, 1992; and Plaintiffs' Surreply, filed August 6, 1992.

(2) Defendants' Motion for Partial Summary Judgment of Noninfringement of U.S. Patent 4,442,980 and Listing of Undisputed Facts and Issues of Law, filed March 16, 1992; Defendants' Supplemental Motion for Partial Summary Judgment of Non–Infringement of U.S. Patent No. 4,442,980, filed March 20, 1992; Plaintiffs' Opposition to Defendants' Motion, filed April 6, 1992; Defendants' Reply, filed April 16, 1992.

(3) Defendants' Memorandum Brief in Support of its Motion for Partial Summary Judgment of Invalidity of U.S. Patent No. 4,442,980 ("On Sale"), filed March 16, 1992; Plaintiffs' Opposition, filed April 6, 1992; Defendants' Reply, filed April 16, 1992; and Plaintiffs' Surreply, filed August 6, 1992.

and

(4) Counter–Defendants' Motion for Summary Judgment on Antitrust Counterclaim, and supporting memorandum filed March 17, 1992; Defendants' Opposition to Counter–Defendants' Motion, filed April 6, 1992; and Counter–Defendants' Reply, filed April 16, 1992.

## I. *Summary Judgment Standard*

"Summary judgment reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1197 (5th Cir.1986).

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment or partial judgment as a matter of law. *See* Fed.R.Civ.P. 56. As the Fifth Circuit stated in *Christophersen v. Allied–Signal Corp.,* 902 F.2d 362, 364 (5th Cir. 1990), "[b]efore a court may grant summary judgment, the moving party must demonstrate that it is entitled to judgment as a matter of law because there is no actual dispute as to an essential element of the plaintiff's case."

The threshold inquiry, therefore, is "whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A movant for summary judgment need not support the motion with evidence negating the opponent's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rather, the burden is on the respondent to the motion to make a showing sufficient to establish each element as to which he will have the burden of proof at trial, provided that he has an adequate opportunity for discovery. *See id.* at 324, 106 S.Ct. at 2553. All evidence, however, must be viewed in the light most favorable to the motion's opponent. *See Gremillion v. Gulf Coast Catering Co.,* 904 F.2d 290, 292 (5th Cir.1990).

The party with the burden of proof who opposes a motion for summary judgment must point out specific facts showing that there is a genuine issue for trial.

Factual specificity is required because summary judgment is designed to go beyond the pleadings in order to assess the proof and ascertain whether a claim is baseless and should be dismissed or, alternatively, whether a genuine fact issue exists and trial is necessary. Because the opponent of a summary judgment motion must designate specific facts, it is not enough that he merely restate his claims—general allegations and self-serving conclusions unsupported by specific facts are not adequate.

*Castillo v. Bowles,* 687 F.Supp. 277, 280 (N.D.Tex.1988), *cert. denied,* 493 U.S. 827, 110 S.Ct. 92, 107 L.Ed.2d 57 (1989) (citations omitted).

"Summary judgment is as appropriate in a patent case as in any other where no genuine issue of material fact is present and the movant is entitled to judgment as a matter of law." *Brenner v. United States,* 773 F.2d 306, 307 (Fed.Cir.1985); *Fraser v. City of San Antonio,* 430 F.2d 1218, 1220 (5th Cir. 1970).

## II. *Invalidity of Patent No. 4,442,980 (Best Mode and Prior Art)* [1]

Plaintiffs claim that Defendants' LAM roller mill infringes on its U.S. Patent No. 4,442,980 ("the '980 Patent"). In response, Defendants argue that the '980 Patent is invalid.

By way of background, the '980 Patent allegedly introduced a novel design in the control for the feed gate of a roller mill for the grinding of grain. It replaced prior mechanical constructions with a pneumatic (air operated) control system. "Valve means" is one of the elements of this system, and is the element at the center of the instant dispute.

Defendants move for summary judgment on their claim that the '980 Patent is invalid on the basis of inequitable conduct. Defendants argue that (1) Plaintiffs failed to disclose as best mode of their invention an operating model which employed the two position PXC–M121 valve, and instead led the patent examiner as well as a person skilled in the art to believe that it incorporated a three position valve; and (2) Plaintiffs failed to disclose prior art on two position valves.

Defendants' motion raises the following inquiries:

(1) whether the '980 Patent represents the use of a three position valve, as the Defendants allege, or a two position valve capable of achieving three positions, as the Plaintiffs allege;

(2) whether the patent examiner was aware that Plaintiffs intended to, and in fact did, use a two position valve and not a three position valve in their invention, and understood how a two position valve would operate as a three position valve;

(3) whether a person skilled in the art would understand that the '980 Patent involves a two position valve, and would know how a two position valve would operate as a three position valve; and

(4) what are the best mode and prior art for the patent.

In opposition to summary judgment, Plaintiffs rely exclusively on the affidavits of Werner Winteler, one of the inventors of the '980 Patent, and Hermann Gaemperle [2], a long time employee of Plaintiffs. Winteler and Gaemperle state that the intended best mode of their invention is a two position valve having "positive overlap or transfer" which has a third position inherent thereto, and that this best mode of operation was fully depicted in the patent in a manner understandable to one skilled in the art. *See* Plaintiffs' Exhibit ("PX") 1, Winteler's Affidavit; PX–2 Gaemperle's Affidavit. As established below, the two position valve used by Defendants was the PXC–M121 valve.

The Winteler and Gaemperle affidavits, however, do not create a "genuine" dispute as to a "material issue of fact" in preclusion of summary judgment; to be genuine, a dispute must be such "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10. Where as here, the nonmoving parties' "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511.

The prosecution history of the patent, the language and depictions of the patent itself, and the testimony of unrelated parties (the manufacturers of the two position PXC–M121 valve used by Plaintiffs), in effect render the affidavits of Winteler and Gaemperle inconsequential [3]. It is clear that the '980

---

1. Reference to exhibits in each section of this opinion corresponds to the numbers employed in the set of pleadings relevant to that section.

2. Defendants move to strike Gaemperle's affidavit because Plaintiffs refused to allow his deposition, and some of his statements and the documents attached to his affidavit had not been previously disclosed in the course of this litigation.

3. The deposition testimony of two of the inventors, including that of Winteler, further contributes to the non-probative nature of Plaintiffs' affidavits.

Patent was based on a three position valve, and not a two position valve which by virtue of a "positive overlap or transfer" attains three positions. Similarly, the intended best mode in the form of a two position valve was not fully disclosed in the patent, and neither the patent examiner nor a person skilled in the art did understand or could have understood use of a two position valve as an embodiment of best mode.

■ A patent is presumed valid, and the burden falls on the Defendants to prove by clear and convincing evidence that the patent is invalid. *See* 35 U.S.C. § 282; *Sjolund v. Musland,* 847 F.2d 1573, 1579 (Fed.Cir.1988). The following factual summary captures the issues pertinent to Defendants' motion.

### A. *Factual Summary*

**Prosecution History**—During prosecution of the patent, Plaintiffs were twice confronted by the Patent Office's rejection of their claims on the basis that they were preempted by Plaintiffs' own prior British patent (UK Patent 698,085). *See* Defendants' Exhibit ("DX") B. In responding to the examiner's first rejection, Plaintiffs argued that the three positions of the valve means were "essential" to their invention, *see* DX–C at 4–5, 8, 11, and specifically stated that "the British patent does not incorporate a three (3) position valve." *Id.* at 8.

However, the examiner once again rejected Plaintiffs' claims finding that "the use of a 3 way valve instead of a 2 way valve is not considered to be patentable subject matter since 3 way valves are notoriously old in the art." DX–D at 3. In their final amendment, Plaintiffs succeeded in overcoming the examiner's objection by arguing that,

> The present invention does far more *than simply substitute a three-way valve for a two-way valve.* . . . [I]t introduces an entirely new mode of operating the control system for the product feed in a grinding mill.

. . . . .

This permits a rapid advance of the metering slide towards the desired position, but avoids overshoots and resulting oscillations that are characteristic of prior control systems. These *advantages* result *from the cooperation of the three-state valve and the "means for mechanically coupling."*

DX–F at 6–8 (emphasis added).

The prosecution history establishes that the patent examiner was led to believe (1) that the Plaintiffs' innovation involved a three position valve, as clearly distinguished from a two position valve, and (2) that the "advantages" of Plaintiffs' innovation resulted from the use of a three position valve.

**The Patent**—Claim 1 of the '980 Patent maintains as one of its innovations the ability of the valve means to produce three "operational modes":

> said valve means having means responsive to the first position of said actuator means for producing a *first operational mode* wherein said valve inlet is blocked and said valve outlet is vented, means responsive to a position of said actuator intermediate said first and second positions for producing a *second operational mode* wherein both said valve inlet and outlet are blocked, and means responsive to the second position of said actuator for producing a *third mode of operation* wherein said valve inlet and outlet are connected with each other.

DX–A, Claim 1 (emphasis added). Substantially identical language appears in Claim 2 of the patent. Significantly, the phrase "positive overlap or transfer", now relied on extensively in the Affidavits of Winteler and Gaemperle as the means by which a two position valve allegedly achieves three positions, finds no precedent in the patent itself.

While the prosecution history and the depictions in the patent point to a three position valve, the data and figures attached to the patent were derived from two position valves [4]. First, the alleged "advantages" re-

---

4. Plaintiffs acknowledge the fact that the data and figures in the patent were derived from the two position PXC–M121 valve, while the depictions in the patent appear as three position valves. They argue, however, relying on the affi-

davits of Winteler and Gaemperle, (1) that it was clear to any person skilled in the art that the three positions were obtained by way of a two position valve which by virtue of a "positive overlap or transfer" attains a third position, and

sulting from a 3–position valve, used by Plaintiffs to secure a patent over the examiner's two rejections, were depicted by Figures 4 and 5 attached to the patent. *See* DX–A cols. 8 and 9; DX–P at 63–66, 76–77. However, Figures 4 and 5 depict test data derived from a working model of the invention which incorporated the PXC–M121 valve which is a two position valve. *See* DX–G; DX–T, Winterler's Deposition at 224–25.

Second, Winteler states that the schematic representations of the valve itself, attached to the patent as Figures 3, 6 and 7, were drawn based on the two positioned PXC–M–121 valve. *See* PX–1, Winteler Affidavit ¶ 10. The depictions attached to the patent, however, show otherwise; element 80 of Figure 3, element 114 of Figure 6 and, once again, element 80 of Figure 7 are depicted as three position valves.

Third, the only schematic representation of the overall system of Plaintiffs' invention is Figure 8, attached to the patent, which depicts and incorporates a three position valve. However, as Winteler states in his affidavit, the working model of Plaintiffs' invention in fact incorporated the two position PXC–M–121 valve. *See* PX–1, Winteler Affidavit ¶ 8.

As regards Figure 8, the deposition testimony of two of the inventors of the patented invention, including that of Winteler, contradict the Plaintiffs' principal allegation, namely: a two position valve achieves a third position by virtue of positive overlap or transfer, in a manner understandable to the patent examiner as well as one skilled in the art. Winteler has testified that he has never witnessed the third position in his models using the two position PXC–M121 valve, but believes it must exist as a matter of "theory"[5]. DX–T, Winteler's Deposition at 160, 166. Furthermore, the valve structure as depicted in Figure 8 with a three position

valve was never built or tested by the inventors of the patent. *See id.* at 164, 183–84, 215; DX–S, Deposition of Ernst Maechler at 291–93. In fact, the inventors could not testify as to how a three position valve as depicted in Figure 8 would work in their invention. *See* DX–T, Winteler's Deposition at 215. And finally, Winteler testified that Figure 8 was "irrelevant" to their invention. DX–T, Winteler's Deposition at 164.

■ There is no evidence that the patent examiner was aware that a two position valve was used for figures and data attached to the patent; and in view of the prosecution history and the patent itself, it is certain that he was led to believe that Plaintiffs' invention involved a three position valve. Furthermore, Figure 8 which incorporates a three position valve is an inoperable and irrelevant construction. Disclosure of a "fictitious" and "inoperable" mode of practicing the invention constitutes inequitable conduct sufficient to render a patent invalid. *Consolidated Aluminum Corp. v. Foseco Int'l, Ltd.,* 910 F.2d 804, 807–809 (Fed.Cir.1990).

**Testimony of the PXC–M121 valve manufacturers**—The PXC–M121 valve is an off-the-shelf product produced by the Telemecanique company. *See* DX–H. Two representatives of Telemecanique who have extensive experience in the field of pneumatic valves independently testified at their deposition that:

(1) PXC–M121 is a two position valve and is so depicted in Telemecanique publications;

(2) Figures 3, 6, and 7 of the '980 Patent depict three position valves and not two position valves;

(3) Nowhere in the '980 Patent is the PXC–M121 valve mentioned; and

---

not from a three position valve; and (2) that it was "common" in the industry to draw three position valves to reflect three "modes of operation" and not a three valve "construction."

5. Plaintiffs also rely on the affidavit of Gaemperle who for the first time states that he has personally experimented with two position valves, such as the PXC–M–121, and can verify and has "felt" the third position that results from the positive overlap or transfer. *See* PX–2,

Gaemperle's Affidavit ¶ 14. This affidavit, especially in view of the testimony of the inventors outlined above, is not sufficient to establish what a person skilled in the art would understand by reading the patent, and what disclosures the inventors made to the examiner at the time of filing. For present purposes, the Court need not determine whether a two position valve capable of achieving a third position by way of positive overlap or transfer exists or is possible.

(4) Figure 8 of the '980 Patent which depicts the only working model of the invention could not have incorporated the PXC–M121 valve, but rather incorporates a three position valve.

DX–Q, Deposition of Pietro Franco DiGrassi at 4–21; DX–R, Deposition of Richard Frappier at 3–19; DX–H through DX–M.

It is not possible to find under the circumstances that a person of ordinary skill in the art, such as the inventors of the valve used by the Plaintiffs, reading the patent would understand that the best mode for Plaintiffs' invention involved a two position valve. Nor is it possible to find that such a person would have understood how a two position valve by virtue of positive overlap or transfer achieves a third position. "Even where there exists a general reference to best mode, the quality of disclosure may be so poor as to effectively result in concealment." *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1536 (Fed.Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).

**Best Mode**—The best mode of the '980 Patent contemplated by Plaintiffs at the time of filing incorporates the PXC–M121 valve[6]. *See supra* pages 1296–98. There is further evidence that the best mode of the patent incorporates the PXC–M121 valve in that Plaintiffs' product allegedly covered by the '980 Patent, the MDDK roller mill, uses the PXC–M121 valve. *See Dana Corp. v. IPC Ltd. Partnership*, 860 F.2d 415, 420 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989) (commercial embodiment of a patent can be evidence of best mode).

As stated above, the PXC–M121 is nowhere mentioned in the '980 Patent. *See also* DX–T, Winteler's Deposition at 220–221. There is also no dispute that at the time of filing for their patent, Plaintiffs had a copy of the Telemecanique manual, widely published in Europe and the United States, which describes the PXC–M121 valve as a two position valve. *See* DX–N, Admissions 37 and 46. Plaintiffs neither disclosed the manual, which was relevant prior art[7], *see* 35 U.S.C. § 102(a), nor informed the patent examiner of their reliance on the PXC–M121 valve.

**B.** *Legal Analysis*

In order to secure a patent, an inventor must provide a written description of the invention "in such full, clear, concise and exact terms as to" (1) enable one skilled in the art to make and use it; and (2) set forth the best mode contemplated by the inventors for carrying out the invention at the time of filing. 35 U.S.C. § 112. "The specificity of disclosure required to comply with the best mode requirement must be determined by the knowledge of facts within the possession of the inventor at the time of filing the application." *Spectra–Physics*, 827 F.2d at 1535. If an inventor fails to disclose a better method of carrying out the invention he is aware of at the time of filing, the patent is invalid. *Consolidated*, 910 F.2d at 807.

In view of the facts outlined above, the Court concludes that Plaintiffs failed to disclose best mode in the form of a structure incorporating the two position PXC–M121 valve, as the intended method at the time of filing, and instead led the patent examiner to believe that their invention incorporated a three position valve. *See Acme Resin Corp. v. Ashland Oil Inc.*, 20 U.S.P.Q.2d 1305, 1313, 1991 WL 274498 (S.D.Ohio 1991), *aff'd* 954 F.2d 735 (Fed.Cir.1992) (granting summary judgment in favor of invalidity where failure to disclose best mode); *Refac Int'l, Ltd. v. IBM*, 689 F.Supp. 422, 431–32 (D.N.J. 1988), *aff'd* 891 F.2d 299 (Fed.Cir.1989) (same).

---

**6.** Plaintiffs, while denying that their best mode incorporates the two position PXC–M121 valve, have not specifically pointed the Court to another best mode set forth by the patent, as required by summary judgment standards.

**7.** Plaintiffs claim that the PXC–M121 valve component of their patent invention cannot be considered prior art since such component was generally available, citing to *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.,*

730 F.2d 1452, 1463 (Fed.Cir.1984). First, *Lindemann* is inapposite in that it relates to the level of disclosure necessary for patent specifications and not prior art. Second, prior art is applicable to individual elements of an invention as well as to the overall invention. *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed.Cir.1986); *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 283, 96 S.Ct. 1532, 1538, 47 L.Ed.2d 784 (1976).

■ Additionally, all applicants for a patent are bound by a duty of "good faith" and "candor" in their dealings with the United States patent office. 37 C.F.R. § 1.56. This duty includes "a duty to disclose to the Office all information known to that individual to be material to patentability." *Id.* Failure to comply with this duty amounts to inequitable conduct and renders a patent unenforceable.

■ Inequitable conduct is established by the following three elements: (1) failure to disclose material information; (2) knowledge of the material information; (3) an intent to deceive. *See Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1420 (Fed.Cir.1989). In order for information to be "material", it is not necessary to show that it would have defeated the claims of the patent; it suffices to show "that a reasonable examiner would have considered the withheld prior art important in deciding whether to issue the patent." *Id.* at 1421. Moreover, "intent" need not be shown by direct evidence but by "a showing of acts the natural consequence of which are presumably intended by the actor." *Id.* at 1422.

The Court concludes that Plaintiffs engaged in inequitable conduct by not disclosing prior art relevant to their contemplated best mode which involved the PXC–M121 two position valve. *See Consolidated*, 910 F.2d at 807–08. Especially in view of the patent's prosecution history, the two position valve was clearly "material" to the patent examiner.

There exists no genuine dispute as to any material issues of fact, and summary judgment is proper. Defendants have established by clear and convincing evidence that Plaintiffs engaged in inequitable conduct by failing to disclose best mode and prior art. Consequently, the '980 Patent is invalid and unenforceable.

Defendants' Motion for Partial Summary Judgment of Invalidity and Unenforceability of the '980 Patent (Best Mode and Prior Art) is **GRANTED**.

### III. *Invalidity of Patent No. 4,442,980 (On Sale)*

■ Defendants move for summary judgment on their claim that the '980 Patent is invalid on a supplemental ground in addition to the best mode and prior art requirements discussed above. Defendants claim that the '980 Patent is invalid because Plaintiffs had reduced to practice a working model of their invention, and had offered their invention for sale before the critical date of December 5, 1979 in violation of 35 U.S.C. § 102(b)[8].

By way of background, as stated above, the '980 Patent allegedly introduced a novel design in the control for the feed gate of a roller mill for the grinding of grain. Significantly, for the purpose of the instant motion, the invention described in the '980 Patent provided for (1) a pneumatic (air operated) servo control system for adjusting the feed gate, and (2) a pneumatic control system for engaging and disengaging the grinding rolls. *See* DX–1, col. 3, lines 8–21. Plaintiffs' MDDK roller mill embodies the '980 Patent. *See* DX–9, Bates Nos. DO22345–346; DX–10, Bates No. 513624; DX–11, Bates No. 514761. According to the inventors of the '980 Patent, the distinguishing feature of the MDDK roller mill, as compared to past MDDB and MDDC models, is the fact that all its control systems are air-operated. *See* DX–23, Ackermann's Deposition at 130; DX–25, Deposition of Hans Wanzenreid at 417; *see also* DX–26, Winteler's Deposition at 36.

The fully pneumatic MDDK roller mill was an improvement on Plaintiffs' previous roller mills which were either entirely non-pneumatic or partially pneumatic. The previous MDDB roller mill had a *manual* mechanism

**8.** The Court notes that Plaintiffs indicated in an interrogatory answer that the MDDK roller mill was first sold in the United States in "about 1980". DX–27, Interrogatory 66. Defendants represent to the Court that it was only through subpoenaed documents from one of Plaintiffs' customers, Seaboard Allied Milling Corporation, that they gained access to information that indicated a significantly earlier sale date; and that once such documents were produced, Plaintiffs offered copies from their own files. Plaintiffs have not contested this representation. Withheld information on the on sale bar in discovery can contribute to "suspicion", and "adverse inferences" against Plaintiffs. *Western Marine Electronics, Inc. v. Furuno Electric Co.*, 764 F.2d 840, 842, 846 (Fed.Cir.1985).

for engaging and disengaging the grinding mills, and a *mechanical* feed gate control mechanism. *See* DX–3, Bates Nos. 516272, 516292; *see also* DX–4, Bates Nos. 514677, 514678–679. The previous MDDC Roller mills had an *electro-pneumatic* (electric and air operated) for automatically engaging and disengaging the grinding rolls, and a *mechanical* feed gate control mechanism. *See* DX–6 Bates No. 515733; *see also* DX–4, Bates Nos. 514677, 514700–705; DX–7, Bates No. D022363.

 The Defendants have the burden to overcome the presumption of patent validity by clear and convincing evidence. *See supra* page 1296.

Section 102(b) reads in relevant part,

A person shall be entitled to a patent unless—

. . . . .

(b) the invention was ... on sale in this country, more than a year prior to the date of the application for patent in the United States [ ("critical date") ].

35 U.S.C. § 102(b). A single offer to sell is enough to bar patentability, whether or not the offer is accepted. *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1311 (Fed.Cir. 1988). The parties are in agreement that the critical date in the instant case is December 5, 1979.

 The court in *Timely Products Corp. v. Arron*, 523 F.2d 288 (2d Cir.1975), adopted a three part test for determining whether an invention has been placed "on sale" within the meaning of Section 102(b) [9]:

(1) the complete invention claimed must have been embodied in or obvious in view of the thing offered for sale;

(2) the invention must have been tested sufficiently to verify that it is operable and commercially marketable; and

9. This test is recognized as the most stringent standard for ascertaining an offer for sale, the application of which is not always warranted. *King Instrument Corp. v. Otari Corp*, 767 F.2d 853, 860 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). For example, the second prong of the test, while it may serve as an important analytical tool, is not "an absolute requirement of the on-sale bar."

(3) the sale must be primarily for profit rather than for experimental purposes.

*King*, 767 F.2d at 860 (citing to *Timely* ). The third prong is presumed to be true where the customer pays for the device, unless the patentee comes forward with evidence of an experimental intent. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 839 (Fed.Cir. 1984).

 The "on sale" requirement of Section 102(b) can be established by "any relevant evidence, such as memoranda, drawings, correspondence, and testimony of witnesses." *RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 1060 (Fed.Cir.1989). The Court must look to the "totality of the circumstances" to determine (1) whether patentee's offer is "new" relative to other offers, and involves the claimed elements of the patented device, and (2) whether the invention was sufficiently tested to ascertain its workability prior to the critical date. *King*, 767 F.2d at 860–61; *see also Barmag*, 731 F.2d at 838–39. The offer of sale need not reference the workings of the invention in detail. *King*, 767 F.2d at 860–61; *RCA*, 887 F.2d at 1060.

To this end, Defendants put forth evidence that establishes the following facts pertinent to the instant motion:

(1) Winteler, one of the inventors of the '980 Patent, in a written report issued October 31, 1979, described the testing of a working model of a new model MDDK roller mill having a pneumatic feed gate control, and a pneumatic mechanism for engaging and disengaging the grinding rolls. *See* DX–8; DX–26, Winteler's Deposition at 54–55, 62–63. The test results of this report were incorporated into the '980 Patent as Figures 4–5. *See* DX–8, Bates Nos. 514838, 514840; DX–26, Winteler's Deposition at 54–55, 224–226.

*UMC Electronics Co. v. United States*, 816 F.2d 647, 656 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). Indeed, there exists no rigid standard for Section 102(b), and "all of the circumstances" surrounding the sale or offer must be weighed in view of the policies underlying the on sale bar. *Id.* at 653, 656.

(2) An assembly drawing of the MDDK roller mill incorporating the invention alleged in the '980 Patent was completed as of October 22, 1979. *See* DX–12; DX–26, Winteler's Deposition at 117, 127, 129–30, 247; DX–24, Maechler's Deposition at 233–37. This type of drawing would be given subsequently to the production department[10]. *Id.* at 234.

(3) In October and November of 1979, Plaintiffs offered to sell to Seaboard Allied Milling Corporation ("Seaboard") their "new" MDDK roller mill "with air supply". DX–13, Bates Nos. 516251, 516255. Plaintiffs upgraded their previous offers of the MDDB and MDDC roller mills with the new MDDK roller mill so as not to risk upsetting Seaboard with a contract for old models. *See* DX–25, Wanzenried's Deposition at 431–33.

(4) A written sales contract was signed by Plaintiffs and Seaboard on November 13, 1979, for MDDK roller mills with "all air operated" controls—referring to the automatic engaging and disengaging of the grinding and feed rolls, and to the automatic feeder gate[11]. *See* DX–15, Bates No. C000074; DX–14, Bates No. 516250. The same substantive description has been used by Plaintiffs to describe their MDDK fully pneumatic roller mills, subsequent to securing the '980 Patent. *See* DX–16, Bates No. 512632; DX–17.

On November 28, 1979, pursuant to the sales contract, Plaintiffs placed an order for 22 MDDK roller mills "with Pneumatically Operated Automatic Engaging and Disengaging" and "without Electrical Controls". *See* DX–21.

(5) According to the Seaboard engineer who personally evaluated the bids for grain milling equipment, Seaboard accepted Plaintiffs' offer of sale with the understanding that it was for the "newest, top of the line" MDDK roller mills which were "all air or pneumatically controlled". *See* DX–2, Declaration of Ronald Graver ¶¶ 7, 8.

(6) The Vice President of Milling at Seaboard visited Plaintiffs' plant in Switzerland on November 29–30, 1979, and saw the MDDK roller mills Seaboard was going to purchase. *See* DX–13; DX–25, Wanzenried's Deposition at 437.

(7) The machines ordered prior to the critical date, when actually delivered to Seaboard, incorporated the alleged invention of the '980 Patent. *See* DX–21–22; DX–27, Ints. 44–45. Beginning in July of 1980, twenty-two fully pneumatic MDDK roller mills were delivered to Seaboard for the amount of $1,830,220.00[12]. *See* DX–15, – 18, –21 & –22.

In sum, it is clear that Plaintiffs offered for sale, and accepted a sales order for, their new MDDK roller mill with all pneumatic controls to Seaboard prior to the critical date of December 5, 1979. *See supra* Facts 3–7. It is also clear that the invention described in the '980 Patent was sufficiently tested to ascertain its workability prior to the critical date of December 5, 1979. *See supra* Facts 1–2, & 6.

In an attempt to challenge the import of this evidence, Plaintiffs primarily raise two arguments. First, Plaintiffs argue that the MDDK roller mill offered for sale to Seaboard was an earlier MDDK model which had a mechanical feed gate control system, and had been utilized in Europe and Africa since the late 1970's, *see* PX–1, Winteler's

---

10. In determining whether a sale within the meaning of Section 102(b) has occurred, the stage of development of an invention is ascertained by the existence of "engineering models, prototypes, and production models." *Western Marine*, 764 F.2d at 845.

11. Plaintiffs assign paramount significance to the fact that the term "Airborne" was not used to describe the MDDK roll mills offered to Seaboard prior to the critical date, whereas the term was universally employed in official statements describing the MDDK fully pneumatic roller mill after the critical date. The inquiry underlying Section 102(b) is whether the device offered for sale can be identified as the invention described by a patent. *See King*, 767 F.2d at 860–61. The use of a single descriptive word such as "Airborne" is not dispositive of this inquiry, and other factors distinguish the patented device and thus permit its identification.

12. The undisputed fact that the devices actually delivered to Seaboard after the critical date incorporated the patented device is "further support that the earlier" offer was for the fully pneumatic MDDK roller mill. *King*, 767 F.2d at 861.

Affidavit ¶¶ 4, 5 & 12; PX–5, Affidavit of Ernst Caderas [13], ¶ 4; and that it is only the later model of the MDDK roller mill which is covered by the '980 Patent and has fully pneumatic controls, including a pneumatic servo control system for the feed gate control.

However, Wanzenried, the head of sales in the United States for Plaintiffs, has testified that the MDDK roller mill offered to Jack Miller, the Vice President of Seaboard, was "new" and not yet marketed:

> We quoted [Miller] this new mill and as he always was, wanted to know what is new. At the time the MDDK was not for sale per se. But I feel I had to inform him that in some time to come there will be a new roller mill, so that I wouldn't get the big complaint why didn't you tell me.
>
> . . . . .
>
> We were working on the new one at the time.

DX–25, Wanzenried's Deposition at 432–33. Wanzenried has further testified that the term "all air controlled" used to define the MDDK offered to Seaboard was not previously used for older models of roller mills, i.e. the MDDB or MDDC. *Id.* at 417. And finally, Plaintiffs have provided no evidence to the Court, and apparently to Defendants despite their numerous requests, attesting to the existence of an earlier MDDK roller mill with a mechanical feed gate control, other than Winteler's assertion to that effect [14].

Second, Plaintiffs argue that the design and testing of the invention described in the '980 Patent did not end until March or April of 1980. *See* PX–1, Winteler's Affidavit ¶ 9. Plaintiffs' argument fails as a matter of law. The fact that additional testing or development occurs after the critical date does not preclude a finding that the invention was tested sufficiently to show that it will work. *Barmag,* 731 F.2d at 838. "There is no requirement for a reduction to practice that the invention, when tested, be in a commercially satisfactory stage of development." *Id.*

The evidence relied on by Plaintiffs in their opposition is not sufficiently probative to create a genuine dispute as to the "on sale bar", and summary judgment is proper. *See Barmag,* 731 F.2d at 837; *Schreiber Manufacturing Co., Inc. v. Saft America, Inc.,* 704 F.Supp. 759, 766–67 (E.D.Mich.1989). Defendants have established by clear and convincing evidence that Plaintiffs' invention described in the '980 Patent was "on sale" prior to the critical date of December 5, 1979 in violation of Section 102(b). Consequently, the '980 Patent is invalid and unenforceable.

Defendants' Motion for Partial Summary Judgment of Invalidity and Unenforceability of the '980 Patent ("On Sale") is **GRANTED.**

## IV. *Infringement of U.S. Patent 4,442,980*

Defendants move for partial summary judgment on noninfringement of the '980 Patent.

Defendants' motion is **DENIED** as moot.

## V. *Antitrust Counterclaim*

Defendants assert a Counterclaim against Plaintiffs, alleging violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants claim that Plaintiffs have knowingly sought to enforce groundless claims of patent infringement, on the basis of invalid patents, with the specific intent of eliminating Defendants from the relevant market, and extending their own monopoly power. Plaintiffs move for summary judgment on the Counterclaim as to all Defendants, and, in the alternative, only as to Defendant Ocrim S.p.A. and Defendant Farmers Elevator of Dawn Inc. ("Farmers") for lack of standing.

---

**13.** The affidavits of Winteler and Caderas are not based on "personal knowledge" as regards their statements on the exchanges that transpired between Plaintiffs and Seaboard, and thus violate the standards set by Federal Rule of Civil Procedure 56(c). *See, e.g.,* PX–1, Winteler's Affidavit ¶ 12 ("I am certain that. . . ."); PX–5, Caderas' Affidavit ¶ 4 ("I am aware that. . . .")

**14.** The Court notes that attached as Appendix A to Winteler's Affidavit is a drawing of the alleged earlier model of the MDDK roller mill with a handwritten inscription to Seaboard that identifies the mill as one with manual feed control. Defendants, however, allege that the inscription was placed on the document just prior to this litigation, and that the drawing was never used for Seaboard. Plaintiffs have not contested this allegation.

■ The Antitrust Counterclaim is asserted under the standard first articulated in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Prosecution of patents procured by inequitable conduct may amount to an unlawful attempt to monopolize, provided other elements necessary for the violation of Section 2 of the Sherman Act are also present. *Id.* at 176–77, 86 S.Ct. at 349–50. "Inequitable conduct" consists of knowing and willful misrepresentations of facts to the Patent Office by the patent owner. *Id.* at 177, 86 S.Ct. at 350. The Court has already found by clear and convincing evidence that the '980 Patent is invalid and unenforceable because of Plaintiffs' inequitable conduct and violation of the on sale bar. *See supra* Sections II and III.

■ Consequently, for the purpose of the instant motion, the only inquiry which remains is whether the elements necessary to a Section 2 violation are also present. Upon review of the pleadings, the Court concludes that material issues of fact exist that preclude summary judgment, namely, as to "the relevant product market [15]", "specific intent" and "market power". The parties' pleadings also reveal a dispute about the proper standard of law governing an antitrust claim based on inequitable patent prosecution. The following analysis establishes the legal standard applicable to the instant case.

■ Identification of the relevant product market is prerequisite to a monopolization claim under Section 2. "[I]t [is] necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved." *Walker*, 382 U.S. at .177, 86 S.Ct. at 350. Without a definition of that market, it is not possible to measure the patent owner's ability to affect competition. *Id.*

■ The relevant market has both geographic and product dimensions. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir.1984). The geographic dimension of the relevant product market is the "area of effective competition where buyers can turn for alternate sources of supply." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991). "The geographic market selected must correspond to the commercial realities of the industry and be economically significant." *Gearhart Industries, Inc. v. Smith International, Inc.*, 592 F.Supp. 203, 212 (N.D.Tex.), *aff'd in relevant part*, 741 F.2d 707 (5th Cir.1984). In cases involving misuse of a U.S. patent as an antitrust violation, the relevant product market has been limited to the United States [16]. *See, e.g., Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1293 (9th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985); *Wahl v. Rexnord, Inc.*, 481 F.Supp. 573, 588–589 (D.N.J.1979), *reversed on other grounds*, 624 F.2d 1169 (3rd Cir.1980); *Prelin Industries, Inc. v. G & G Crafts, Inc.*, 357 F.Supp. 52, 70 (W.D.Okla.1972). As Defendants suggest, this limitation is due to the fact that the United States is the *only* geographic market where a U.S. patent can be "misused" in a manner leading to antitrust violations, as first articulated in *Walker, supra.*

■ The relevant product market must include "products that have reasonable interchangeability for the purposes for which they are produced," *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). Products need not be fungible, however, to qualify as reasonable substitutes. *Yoder Brothers, Inc. v. California–Florida Plant*

**15.** Defendants maintain that the relevant product market is the market for sale in the United States of newly built, European (automatic) grain roller mills. Plaintiffs, however, propose a much broader market which includes the sale of roller mills (European, Japanese, Mexican and American), both old and new, throughout the world.

**16.** Plaintiffs allege that since the major competitors in the area of roller mills compete worldwide, the relevant geographic market is the entire world, and is not limited to the United States. Plaintiffs rely on the case of *Gearhart, supra*, where the court found that in the case of a proposed acquisition challenged under Section 7 of the Clayton Act, 15 U.S.C. § 18, the relevant geographic market was the entire world. There is no authority for Plaintiffs' allegation, however, in a case where misuse of a U.S. patent leads to antitrust violations.

*Corp.,* 537 F.2d 1347, 1366 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). In determining whether products are reasonable substitutes, the Court looks to such factors as "functional interchangeability, responsiveness of the sales of one product to the price changes of the other, and degree of competition from the potential substitute." *Id.* at 1367. "If the differences in the two products' price, use, and qualities become too great, then they can no longer be said to be reasonably interchangeable." *Id.* at 1366.

■ In order to be subject to the sanctions of the Sherman Act, the patent owner must have either monopoly market power, or a dangerous probability of acquiring monopoly power. Monopoly power is "the power to control price or exclude competition" with reference to a relevant market. *Du Pont,* 351 U.S. at 391, 76 S.Ct. at 1005. In the first instance, the elements necessary to a Section 2 violation are:

(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

In the second instance, the necessary elements are (1) a specific intent to monopolize and (2) a dangerous probability that the attempt to monopolize the relevant market will be successful. *Domed,* 732 F.2d at 490. "Specific intent" is established "not only by direct evidence of unlawful design, but by circumstantial evidence of illegal conduct." *Handgards,* 743 F.2d at 1293. Thus, "the requisite intent to monopolize ... could be inferred from the finding of bad faith[17]." *Id.*

■ While proof of actual exclusion of competition from the market can establish

the patent holder's "dangerous probability" of success, it is not necessary to such a finding[18]. A dangerous probability of success can also be established by,

(1) ... direct evidence of specific intent plus proof of conduct directed to accomplishing the unlawful design; or

(2) ... evidence of conduct alone, provided the conduct is also the sort from which specific intent can be inferred.

*Handgards,* 743 F.2d at 1293–94.

■ Plaintiffs also allege that Defendant Ocrim S.p.A. and Defendant Farmers lack standing to assert their Antitrust Counterclaim because their antitrust injury, if any, is indirect. *See Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 538–41, 103 S.Ct. 897, 908–10, 74 L.Ed.2d 723 (1983); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

Defendant Ocrim S.p.A. is the manufacturer of the accused product, the LAM roller mill, and is subject to Plaintiffs' infringement claims. Defendant Ocrim S.p.A. sells its roller mills in Italy to Defendant Ocrim America, who in turn sells them in the United States. In the case that Plaintiffs' infringement claims are successful, it is clear that Defendant Ocrim S.p.A. will suffer direct injury in lost LAM roller mill sales. Defendant Ocrim S.p.A. has standing to assert the Antitrust Counterclaim due to its alleged commercial injury. *See In re Municipal Bond Reporting Antitrust Lit.,* 672 F.2d 433, 435 (5th Cir.1982); *Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d 1172, 1176 (5th Cir.1976).

Defendant Farmers, a milling company, purchased lower priced LAM roller mills, relative to Plaintiffs' product, from Defendant Ocrim America. During pendency of this infringement action, Farmers has been barred from purchasing roller mills from Ocrim America, and claims loss of business opportunity and injury as a result thereof[19].

---

17. Plaintiffs incorrectly argue that the requisite intent to monopolize must be established in complete isolation from a finding of bad faith prosecution. *See* Plaintiffs' Memorandum at 8–9.

18. Plaintiffs incorrectly argue that the only means of establishing "dangerous probability" is

through proof of actual exclusion of competition. *See* Memorandum at 13–17.

19. Farmers also claims as injury the litigation expenses resulting from Plaintiffs' infringement action. Apparently, however, such expenses are

Defendants further claim that the injury visited upon Farmers is parcel to Plaintiffs' attempts to diminish competition by placing undue burden on customers of their competitors. Farmers as a direct customer of a party allegedly injured by anticompetitive conduct, such as Ocrim America, has standing to sue for damages arising out of the illegal conduct. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 478–84, 102 S.Ct. 2540, 2547–51, 73 L.Ed.2d 149 (1982).

Accordingly, Plaintiffs' Motion for Summary Judgment on Defendants' Antitrust Claim is **DENIED**.

### VI. *Conclusion*

Based on the foregoing reasons, Defendants' Motion for Partial Summary Judgment of Invalidity and Unenforceability of U.S. Patent No. 4,442,980 (Best Mode and Prior Art) is **GRANTED**; Defendants' Motion for Partial Summary Judgment of Invalidity and Unenforceability of U.S. Patent No. 4,442,980 (On Sale) is **GRANTED**; Defendants' Motion for Partial Summary Judgment of Noninfringement of U.S. Patent No. 4,442,980 is **DENIED** as moot; and Plaintiffs' Motion for Summary Judgment on Antitrust Counterclaim is **DENIED**.

SO ORDERED.

shouldered by Ocrim S.p.A. and Ocrim America and not Farmers.